IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE DISTRICT OF SOUTH CAROLINA
ANDERSON/GREENWOOD DIVISION

| | | |
|---|---|---|
| Rosalyn Cruz Diaz, | ) | Civil Action No.  8:13-cv-00705-RMG-JDA |
| Plaintiff, | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| | ) | **OF THE MAGISTRATE JUDGE** |
| vs. | ) | |
| | ) | |
| Carolyn W. Colvin, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

This matter is before the Court for a Report and Recommendation pursuant to Local Civil Rule 73.02(B)(2)(a), D.S.C., and 28 U.S.C. § 636(b)(1)(B).[1]  Plaintiff brought this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3) to obtain judicial review of a final decision of the Commissioner of Social Security ("the Commissioner"), denying Plaintiff's claim for supplemental security income ("SSI").[2]  For the reasons set forth below, it is recommended that the decision of the Commissioner be affirmed.

## PROCEDURAL HISTORY

On November 9, 2009, Plaintiff filed a claim for SSI, alleging an onset of disability date of August 1, 2006.  [R. 231–237.]  The claim was denied initially and on reconsideration by the Social Security Administration ("the Administration").  [R. 106–10, 113–15.] Plaintiff requested a hearing before an administrative law judge ("ALJ") [R. 118],

---

[1]A Report and Recommendation is being filed in this case, in which one or both parties declined to consent to disposition by a magistrate judge.

[2] Section 1383(c)(3) provides, "The final determination of the Commissioner of Social Security after a hearing under paragraph (1) shall be subject to judicial review as provided in section 405(g) of this title to the same extent as the Commissioner's final determinations under section 405 of this title."  42 U.S.C. § 1383(c)(3).

and on April 26, 2011 and November 1, 2011, with the help of a Spanish interpreter, ALJ Martha Bower conducted de novo hearings on Plaintiff's claims. [R. 74–88, 46–68.] The ALJ issued a decision on November 10, 2011, finding Plaintiff not disabled. [R. 21–45.]

At Step 1,[3] the ALJ found Plaintiff had not engaged in substantial gainful activity since November 9, 2009, the application date. [R. 29, Finding 1.] At Step 2, the ALJ found Plaintiff had the severe impairment of bilateral carpal tunnel syndrome ("CTS"). [R. 30, Finding 2.] At Step 3, the ALJ determined Plaintiff did not have an impairment or combination of impairments that met or medically equaled the criteria of one of the impairments listed at 20 C.F.R. Part 404, Subpart P, Appendix 1. [R. 34, Finding 3.] The ALJ specifically considered Listings 1.00 and 12.00. [*Id.*]

Before addressing Step 4, Plaintiff's ability to perform her past relevant work, the ALJ found Plaintiff retained the following residual functional capacity ("RFC"):

> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 416.967(b) except for occasional forceful bilateral grasping, twisting, and turning and a need to avoid concentrated exposure to vibration.

[R. 34, Finding 4.] Based on this RFC finding, the ALJ determined at Step 4 that Plaintiff could perform her past relevant work as a secretary (skilled, sedentary exertion) and a cashier (unskilled, light exertion). [R. 37, Finding 5.] Additionally, the ALJ determined that based on testimony of the vocational expert and considering Plaintiff's age, education, work experience, and RFC, Plaintiff was capable of making a successful adjustment to other work that existed in significant numbers in the national economy. [R. 39.] Accordingly, the

---

[3]The five-step sequential analysis used to evaluate disability claims is discussed in the Applicable Law section, *infra*.

ALJ found Plaintiff had not been under a disability as defined in the Act since November 9, 2009, the date the application was filed.  [R. 39, Finding 6.]

Plaintiff requested Appeals Council review of the ALJ's decision, but the Council declined review [R. 1–8].  Plaintiff filed this action for judicial review on March 15, 2013. [Doc. 1.]

## THE PARTIES' POSITIONS

Plaintiff argues that the ALJ's decision is not supported by substantial evidence and should be remanded because the ALJ

1. erred in finding that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 [Doc. 14 at 15–25];

2. erred in finding that Plaintiff had the residual functional capacity to perform light work as defined in 20 CFR 416.967(b) except for occasional forceful bilateral grasping, twisting, and turning and a need to avoid concentrated exposure to vibration [*id.* at 25–29]; and

3. erred in finding that Plaintiff is capable of performing past relevant work as a secretary and a cashier [*id.* at 29–32].

The Commissioner, on the other hand, contends the ALJ's decision is supported by substantial evidence and that the ALJ

1. properly evaluated the opinions of Dr. Harris and Ms. Giouard [Doc. 18 at 12–15];

2. properly concluded that the Plaintiff's impairments did not meet or medically equal Listing 1.02 or Listing 12.04  [*id.* at 15–18];

2. properly assessed Plaintiff's RFC [*id.* at 19]; and

3. properly found that Plaintiff could perform her past relevant work [*id.* at 19–20].

3

## STANDARD OF REVIEW

The Commissioner's findings of fact are conclusive if supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence is more than a scintilla—i.e., the evidence must do more than merely create a suspicion of the existence of a fact and must include such relevant evidence as a reasonable person would accept as adequate to support the conclusion. *See Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)); *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966) (citing *Woolridge v. Celebrezze*, 214 F. Supp. 686, 687 (S.D.W. Va. 1963)) ("Substantial evidence, it has been held, is evidence which a reasoning mind would accept as sufficient to support a particular conclusion.  It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance.  If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'").

Where conflicting evidence "allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the [Commissioner] (or the [Commissioner's] designate, the ALJ)," not on the reviewing court.  *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996); *see also  Edwards v. Sullivan*, 937 F.2d 580, 584 n.3 (11th Cir. 1991) (stating that where the Commissioner's decision is supported by substantial evidence, the court will affirm, even if the reviewer would have reached a contrary result as finder of fact and even if the reviewer finds that the evidence preponderates against the Commissioner's decision).  Thus, it is not within the province of a reviewing court to determine the weight of the evidence, nor is it the court's function to substitute its judgment for that of the Commissioner so long as the decision is supported by substantial evidence.

4

See *Bird v. Commissioner*, 699 F.3d 337, 340 (4th Cir. 2012); *Laws*, 368 F.2d at 642; *Snyder v. Ribicoff*, 307 F.2d 518, 520 (4th Cir. 1962).

The reviewing court will reverse the Commissioner's decision on plenary review, however, if the decision applies incorrect law or fails to provide the court with sufficient reasoning to determine that the Commissioner properly applied the law. *Myers v. Califano*, 611 F.2d 980, 982 (4th Cir. 1980); *see also Keeton v. Dep't of Health & Human Servs.*, 21 F.3d 1064, 1066 (11th Cir. 1994). Where the Commissioner's decision "is in clear disregard of the overwhelming weight of the evidence, Congress has empowered the courts to modify or reverse the [Commissioner's] decision 'with or without remanding the cause for a rehearing.'" *Vitek v. Finch*, 438 F.2d 1157, 1158 (4th Cir. 1971) (quoting 42 U.S.C. § 405(g)). Remand is unnecessary where "the record does not contain substantial evidence to support a decision denying coverage under the correct legal standard and when reopening the record for more evidence would serve no purpose." *Breeden v. Weinberger*, 493 F.2d 1002, 1012 (4th Cir. 1974).

The court may remand a case to the Commissioner for a rehearing under sentence four or sentence six of 42 U.S.C. § 405(g). *Sargent v. Sullivan*, 941 F.2d 1207 (4th Cir. 1991) (unpublished table decision). To remand under sentence four, the reviewing court must find either that the Commissioner's decision is not supported by substantial evidence or that the Commissioner incorrectly applied the law relevant to the disability claim. *See, e.g.*, *Jackson v. Chater*, 99 F.3d 1086, 1090–91 (11th Cir. 1996) (holding remand was appropriate where the ALJ failed to develop a full and fair record of the claimant's residual functional capacity); *Brehem v. Harris*, 621 F.2d 688, 690 (5th Cir. 1980) (holding remand was appropriate where record was insufficient to affirm but was also insufficient for court

5

to find the claimant disabled). Where the court cannot discern the basis for the Commissioner's decision, a remand under sentence four is usually the proper course to allow the Commissioner to explain the basis for the decision or for additional investigation. *See Radford v. Commissioner*, 734 F.3d 288, 295 (4th Cir. 2013) (quoting *Florida Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985);*see also Smith v. Heckler*, 782 F.2d 1176, 1181–82 (4th Cir. 1986) (remanding case where decision of ALJ contained "a gap in its reasoning" because ALJ did not say he was discounting testimony or why); *Gordon v. Schweiker*, 725 F.2d 231, 235 (4th Cir. 1984) (remanding case where neither the ALJ nor the Appeals Council indicated the weight given to relevant evidence). On remand under sentence four, the ALJ should review the case on a complete record, including any new material evidence. *See Smith*, 782 F.2d at 1182 ("The [Commissioner] and the claimant may produce further evidence on remand."). After a remand under sentence four, the court enters a final and immediately appealable judgment and then loses jurisdiction. *Sargent*, 941 F.2d 1207 (citing *Melkonyan v. Sullivan*, 501 U.S. 89, 102 (1991)).

In contrast, sentence six provides:

> The court may . . . at any time order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding . . . .

42 U.S.C. § 405(g). A reviewing court may remand a case to the Commissioner on the basis of new evidence only if four prerequisites are met: (1) the evidence is relevant to the determination of disability at the time the application was first filed; (2) the evidence is material to the extent that the Commissioner's decision might reasonably have been different had the new evidence been before him; (3) there is good cause for the claimant's

6

failure to submit the evidence when the claim was before the Commissioner; and (4) the claimant made at least a general showing of the nature of the new evidence to the reviewing court. *Borders v. Heckler*, 777 F.2d 954, 955 (4th Cir. 1985) (citing 42 U.S.C. § 405(g); *Mitchell v. Schweiker*, 699 F.2d 185, 188 (4th Cir. 1983); *Sims v. Harris*, 631 F.2d 26, 28 (4th Cir. 1980); *King v. Califano*, 599 F.2d 597, 599 (4th Cir. 1979)), *superseded by amendment to statute*, 42 U.S.C. § 405(g), *as recognized in Wilkins v. Sec'y, Dep't of Health & Human Servs.*, 925 F.2d 769, 774 (4th Cir. 1991).[4]  With remand under sentence six, the parties must return to the court after remand to file modified findings of fact. *Melkonyan*, 501 U.S. at 98.  The reviewing court retains jurisdiction pending remand and does not enter a final judgment until after the completion of remand proceedings.  *See Allen v. Chater*, 67 F.3d 293 (4th Cir. 1995) (unpublished table decision) (holding that an order remanding a claim for Social Security benefits pursuant to sentence six of 42 U.S.C. § 405(g) is not a final order).

## **APPLICABLE LAW**

The Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a disability.  42 U.S.C. § 423(a).  "Disability" is defined as:

---

[4]Though the court in *Wilkins* indicated in a parenthetical that the four-part test set forth in *Borders* had been superseded by an amendment to 42 U.S.C. § 405(g), courts in the Fourth Circuit have continued to cite the requirements outlined in *Borders* when evaluating a claim for remand based on new evidence. *See, e.g., Brooks v. Astrue*, No. 6:10-cv-152, 2010 WL 5478648, at *8 (D.S.C. Nov. 23, 2010); *Ashton v. Astrue*, No. TMD 09-1107, 2010 WL 3199345, at *3 (D. Md. Aug. 12, 2010); *Washington v. Comm'r of Soc. Sec.*, No. 2:08-cv-93, 2009 WL 86737, at *5 (E.D. Va. Jan. 13, 2009); *Brock v. Sec'y of Health & Human Servs.*, 807 F. Supp. 1248, 1250 n.3 (S.D.W. Va. 1992).  Further, the Supreme Court of the United States has not suggested *Borders*' construction of § 405(g) is incorrect.  *See Sullivan v. Finkelstein*, 496 U.S. 617, 626 n.6 (1990).  Accordingly, the Court will apply the more stringent *Borders* inquiry.

> the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 consecutive months.

*Id.* § 423(d)(1)(A).

## I.    The Five Step Evaluation

To facilitate uniform and efficient processing of disability claims, federal regulations have reduced the statutory definition of disability to a series of five sequential questions. *See, e.g.*, *Heckler v. Campbell*, 461 U.S. 458, 461 n.2 (1983) (noting a "need for efficiency" in considering disability claims). The ALJ must consider whether (1) the claimant is engaged in substantial gainful activity; (2) the claimant has a severe impairment; (3) the impairment meets or equals an impairment included in the Administration's Official Listings of Impairments found at 20 C.F.R. Pt. 404, Subpt. P, App. 1; (4) the impairment prevents the claimant from performing past relevant work; and (5) the impairment prevents the claimant from having substantial gainful employment. 20 C.F.R. § 416.920. Through the fourth step, the burden of production and proof is on the claimant. *Grant v. Schweiker*, 699 F.2d 189, 191 (4th Cir. 1983). The claimant must prove disability on or before the last day of her insured status to receive disability benefits. *Everett v. Sec'y of Health, Educ. & Welfare*, 412 F.2d 842, 843 (4th Cir. 1969). If the inquiry reaches step five, the burden shifts to the Commissioner to produce evidence that other jobs exist in the national economy that the claimant can perform, considering the claimant's age, education, and work experience. *Grant*, 699 F.2d at 191. If at any step of the evaluation the ALJ can find

8

an individual is disabled or not disabled, further inquiry is unnecessary.  20 C.F.R. § 416.920(a)(4); *Hall v. Harris*, 658 F.2d 260, 264 (4th Cir. 1981).

### A.     *Substantial Gainful Activity*

"Substantial gainful activity" must be both substantial—involves doing significant physical or mental activities, 20 C.F.R. § 416.972(a)—and gainful—done for pay or profit, whether or not a profit is realized, *id.* § 416.972(b).  If an individual has earnings from employment or self-employment above a specific level set out in the regulations, he is generally presumed to be able to engage in substantial gainful activity. *Id.* § 416.974–.975.

### B.     *Severe Impairment*

An impairment is "severe" if it significantly limits an individual's ability to perform basic work activities.  *See id.* § 416.921.  When determining whether a claimant's physical and mental impairments are sufficiently severe, the ALJ must consider the combined effect of all of the claimant's impairments.  42 U.S.C. §§ 423(d)(2)(B), 1382c(a)(3)(G).  The ALJ must evaluate a disability claimant as a whole person and not in the abstract, having several hypothetical and isolated illnesses. *Walker v. Bowen*, 889 F.2d 47, 49–50 (4th Cir. 1989) (stating that, when evaluating the effect of a number of impairments on a disability claimant, "the [Commissioner] must consider the combined effect of a claimant's impairments and not fragmentize them").  Accordingly, the ALJ must make specific and well-articulated findings as to the effect of a combination of impairments when determining whether an individual is disabled.  *Id.* at 50 ("As a corollary to this rule, the ALJ must adequately explain his or her evaluation of the combined effects of the impairments.").  If

9

the ALJ finds a combination of impairments to be severe, "the combined impact of the impairments shall be considered throughout the disability determination process."  42 U.S.C. §§ 423(d)(2)(B), 1382c(a)(3)(G).

### C.     *Meets or Equals an Impairment Listed in the Listings of Impairments*

If a claimant's impairment or combination of impairments meets or medically equals the criteria of a listing found at 20 C.F.R. Pt. 404, Subpt. P, App.1 and meets the duration requirement found at 20 C.F.R. § 416.909, the ALJ will find the claimant disabled without considering the claimant's age, education, and work experience.[5]     20 C.F.R. § 416.920(a)(4)(iii), (d).

### D.     *Past Relevant Work*

The assessment of a claimant's ability to perform past relevant work "reflect[s] the statute's focus on the functional capacity retained by the claimant."  *Pass v. Chater*, 65 F.3d 1200, 1204 (4th Cir. 1995).  At this step of the evaluation, the ALJ compares the claimant's residual functional capacity[6] with the physical and mental demands of the kind of work he has done in the past to determine whether the claimant has the residual functional capacity to do his past work.  20 C.F.R. § 416.960(b).

### E.     *Other Work*

As previously stated, once the ALJ finds that a claimant cannot return to her prior work, the burden of proof shifts to the Commissioner to establish that the claimant could

---

[5]The Listing of Impairments is applicable to SSI claims pursuant to 20 C.F.R. §§ 416.911, 416.925.

[6]Residual functional capacity is "the most [a claimant] can still do despite [his] limitations."  20 C.F.R. § 416.945(a)(1).

10

perform other work that exists in the national economy. *See* 20 C.F.R. § 416.920(f)–(g); *Hunter v. Sullivan*, 993 F.2d 31, 35 (4th Cir. 1992). To meet this burden, the Commissioner may sometimes rely exclusively on the Medical-Vocational Guidelines (the "grids"). Exclusive reliance on the "grids" is appropriate where the claimant suffers primarily from an exertional impairment, without significant nonexertional factors.[7] 20 C.F.R. Pt. 404, Subpt. P, App. 2, § 200.00(e); *Gory v. Schweiker*, 712 F.2d 929, 930–31 (4th Cir. 1983) (stating that exclusive reliance on the grids is appropriate in cases involving exertional limitations). When a claimant suffers from both exertional and nonexertional limitations, the grids may serve only as guidelines. *Gory*, 712 F.2d at 931. In such a case, the Commissioner must use a vocational expert to establish the claimant's ability to perform other work. 20 C.F.R. § 416.969a; *see Walker*, 889 F.2d at 49–50 ("Because we have found that the grids cannot be relied upon to show conclusively that claimant is not disabled, when the case is remanded it will be incumbent upon the [Commissioner] to prove by expert vocational testimony that despite the combination of exertional and nonexertional impairments, the claimant retains the ability to perform specific jobs which exist in the national economy."). The purpose of using a vocational expert is "to assist the ALJ in determining whether there is work available in the national economy which this particular claimant can perform." *Walker*, 889 F.2d at 50. For the vocational expert's testimony to

---

[7]An exertional limitation is one that affects the claimant's ability to meet the strength requirements of jobs. 20 C.F.R. § 416.969a(a). A nonexertional limitation is one that affects the ability to meet the demands of the job other than the strength demands. *Id.* Examples of nonexertional limitations include but are not limited to difficulty functioning because of being nervous, anxious, or depressed; difficulty maintaining attention or concentrating; difficulty understanding or remembering detailed instructions; difficulty seeing or hearing. § 416.969a(c)(1).

be relevant, "it must be based upon a consideration of all other evidence in the record, . . . and it must be in response to proper hypothetical questions which fairly set out all of claimant's impairments." *Id.* (citations omitted).

## II.    Developing the Record

The ALJ has a duty to fully and fairly develop the record. *See Cook v. Heckler*, 783 F.2d 1168, 1173 (4th Cir. 1986).  The ALJ is required to inquire fully into each relevant issue.  *Snyder*, 307 F.2d at 520.  The performance of this duty is particularly important when a claimant appears without counsel.  *Marsh v. Harris*, 632 F.2d 296, 299 (4th Cir. 1980).  In such circumstances, "the ALJ should scrupulously and conscientiously probe into, inquire of, and explore for all the relevant facts, . . . being especially diligent in ensuring that favorable as well as unfavorable facts and circumstances are elicited."  *Id.* (internal quotations and citations omitted).

## III.    Treating Physicians

If a treating physician's opinion on the nature and severity of a claimant's impairments is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" in the record, the ALJ must give it controlling weight.  20 C.F.R. § 416.927(c)(2); *see Mastro v. Apfel*, 270 F.3d 171, 178 (4th Cir. 2001).  The ALJ may discount a treating physician's opinion if it is unsupported or inconsistent with other evidence, i.e., when the treating physician's opinion does not warrant controlling weight, *Craig*, 76 F.3d at 590, but the ALJ must nevertheless assign a weight to the medical opinion based on the 1) length of the treatment relationship

and the frequency of examination; 2) nature and extent of the treatment relationship; 3) supportability of the opinion; 4) consistency of the opinion with the record a whole; 5) specialization of the physician; and 6) other factors which tend to support or contradict the opinion, 20 C.F.R. § 416.927(c).  Similarly, where a treating physician has merely made conclusory statements, the ALJ may afford the opinion such weight as is supported by clinical or laboratory findings and other consistent evidence of a claimant's impairments. *See Craig*, 76 F.3d at 590 (holding there was sufficient evidence for the ALJ to reject the treating physician's conclusory opinion where the record contained contradictory evidence).

In any instance, a treating physician's opinion is generally entitled to more weight than a consulting physician's opinion.  *See Mitchell v. Schweiker*, 699 F.2d 185, 187 (4th Cir. 1983) (stating that treating physician's opinion must be accorded great weight because "it reflects an expert judgment based on a continuing observation of the patient's condition for a prolonged period of time"); 20 C.F.R. § 416.927(c)(2).  An ALJ determination coming down on the side of a non-examining, non-treating physician's opinion can stand only if the medical testimony of examining and treating physicians goes both ways.  *Smith v. Schweiker*, 795 F.2d 343, 346 (4th Cir. 1986).  Further, the ALJ is required to review all of the medical findings and other evidence that support a medical source's statement that a claimant is disabled.  20 C.F.R. § 416.927(d).  However, the ALJ is responsible for making the ultimate determination about whether a claimant meets the statutory definition of disability.  *Id.*

## IV.    Medical Tests and Examinations

13

The ALJ is required to order additional medical tests and exams only when a claimant's medical sources do not give sufficient medical evidence about an impairment to determine whether the claimant is disabled. 20 C.F.R. § 416.917; *see also Conley v. Bowen*, 781 F.2d 143, 146 (8th Cir. 1986). The regulations are clear: a consultative examination is not required when there is sufficient medical evidence to make a determination on a claimant's disability. 20 C.F.R. § 416.917. Under the regulations, however, the ALJ may determine that a consultative examination or other medical tests are necessary. *Id.*

## V.    Pain

Congress has determined that a claimant will not be considered disabled unless he furnishes medical and other evidence (e.g., medical signs and laboratory findings) showing the existence of a medical impairment that could reasonably be expected to produce the pain or symptoms alleged. 42 U.S.C. § 423(d)(5)(A). In evaluating claims of disabling pain, the ALJ must proceed in a two-part analysis. *Morgan v. Barnhart,* 142 F. App'x 716, 723 (4th Cir. 2005) (unpublished opinion). First, "the ALJ must determine whether the claimant has produced medical evidence of a 'medically determinable impairment which could reasonably be expected to produce . . . the actual pain, in the amount and degree, alleged by the claimant.'" *Id.* (quoting *Craig*, 76 F.3d at 594). Second, "if, and only if, the ALJ finds that the claimant has produced such evidence, the ALJ must then determine, as a matter of fact, whether the claimant's underlying impairment *actually* causes her alleged pain." *Id.* (emphasis in original) (citing *Craig*, 76 F.3d at 595).

14

Under the "pain rule" applicable within the United States Court of Appeals for the Fourth Circuit, it is well established that "subjective complaints of pain and physical discomfort could give rise to a finding of total disability, even when those complaints [a]re not supported fully by objective observable signs."  *Coffman v. Bowen*, 829 F.2d 514, 518 (4th Cir. 1987) (citing *Hicks v. Heckler*, 756 F.2d 1022, 1023 (4th Cir. 1985)).  The ALJ must consider all of a claimant's statements about his symptoms, including pain, and determine the extent to which the symptoms can reasonably be accepted as consistent with the objective medical evidence.  20 C.F.R. § 416.928.  Indeed, the Fourth Circuit has rejected a rule which would require the claimant to demonstrate objective evidence of the pain itself, *Jenkins v. Sullivan*, 906 F.2d 107, 108 (4th Cir. 1990), and ordered the Commissioner to promulgate and distribute to all administrative law judges within the circuit a policy stating Fourth Circuit law on the subject of pain as a disabling condition, *Hyatt v. Sullivan*, 899 F.2d 329, 336–37 (4th Cir. 1990).  The Commissioner thereafter issued the following "Policy Interpretation Ruling":

> This Ruling supersedes, only in states within the Fourth Circuit (North Carolina, South Carolina, Maryland, Virginia and West Virginia), Social Security Ruling (SSR) 88-13, Titles II and XVI: Evaluation of Pain and Other Symptoms:
>
> ...
>
> **FOURTH CIRCUIT STANDARD:** Once an underlying physical or [m]ental impairment that could reasonably be expected to cause pain is shown by medically acceptable objective evidence, such as clinical or laboratory diagnostic techniques, the adjudicator must evaluate the disabling effects of a disability claimant's pain, even though its intensity or severity is shown only by subjective evidence.  If an underlying impairment capable of causing pain is shown, subjective evidence of the pain, its intensity or degree can, by itself,

> support a finding of disability. Objective medical evidence of
> pain, its intensity or degree (i.e., manifestations of the
> functional effects of pain such as deteriorating nerve or muscle
> tissue, muscle spasm, or sensory or motor disruption), if
> available, should be obtained and considered. Because pain
> is not readily susceptible of objective proof, however, the
> absence of objective medical evidence of the intensity,
> severity, degree or functional effect of pain is not
> determinative.

SSR 90-1p, 55 Fed. Reg. 31,898-02, at 31,899 (Aug. 6, 1990). SSR 90-1p has since been

superseded by SSR 96-7p, which is consistent with SSR 90-1p. *See* SSR 96-7p, 61 Fed.

Reg. 34,483-01 (July 2, 1996). SSR 96-7p provides, "If an individual's statements about

pain or other symptoms are not substantiated by the objective medical evidence, the

adjudicator must consider all of the evidence in the case record, including any statements

by the individual and other persons concerning the individual's symptoms." *Id.* at 34,485;

*see also* 20 C.F.R. § 416.929(c)(1)–(c)(2) (outlining evaluation of pain).

## VI.    Credibility

The ALJ must make a credibility determination based upon all the evidence in the

record. Where an ALJ decides not to credit a claimant's testimony about pain, the ALJ

must articulate specific and adequate reasons for doing so, or the record must be obvious

as to the credibility finding. *Hammond v. Heckler*, 765 F.2d 424, 426 (4th Cir. 1985).

Although credibility determinations are generally left to the ALJ's discretion, such

determinations should not be sustained if they are based on improper criteria. *Breeden*,

493 F.2d at 1010 ("We recognize that the administrative law judge has the unique

advantage of having heard the testimony firsthand, and ordinarily we may not disturb

credibility findings that are based on a witness's demeanor. But administrative findings

16

based on oral testimony are not sacrosanct, and if it appears that credibility determinations are based on improper or irrational criteria they cannot be sustained.").

## APPLICATION AND ANALYSIS

### Listing Analysis

Plaintiff argues the ALJ improperly found that her impairments, either singly or in combination, failed to meet or equal the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1. [Doc. 14 at 15–25.] Specifically, Plaintiff contends she meets Listings 1.02 and 12.04. [*Id.*]

To determine whether a claimant's impairments meet or equal a listed impairment, the ALJ identifies the relevant listed impairments and compares the listing criteria with the evidence of the claimant's symptoms. *See Cook*, 783 F.2d at 1173 (stating that without identifying the relevant listings and comparing the claimant's symptoms to the listing criteria, "it is simply impossible to tell whether there was substantial evidence to support the determination"). "In cases where there is 'ample factual support in the record' for a particular listing, the ALJ must provide a full analysis to determine whether the claimant's impairment meets or equals the listing." *Beckman v. Apfel*, No. WMN-99-3696, 2000 WL 1916316, at *9 (D. Md. Dec. 15, 2000) (unpublished opinion) (quoting *Cook*, 783 F.2d at 1172). While the ALJ may rely on the opinion of a State agency medical consultant in conducting a listing analysis, 20 C.F.R. § 416.927(e)(2)(iii), the ALJ ultimately bears the responsibility for deciding whether a claimant's impairments meet or equal a listing, *id.* § 416.927(d)(2).

### *Criteria of Relevant Listings*

### Listing 1.02

Listing 1.00 is the general listing for impairments to the Musculoskeletal System.

Listing 1.02 provides as follows:

> 1.02   Major dysfunction of a joint(s) (due to any cause):
>
> Characterized by gross anatomical deformity (e.g., subluxation, contracture, bony or fibrous ankylosis, instability) and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint(s), and findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis of the affected joint(s).  With:
>
> A.      Involvement of one major peripheral weight-bearing joint (i.e., hip, knee, or ankle), resulting in inability to ambulate effectively, as defined in 1.00B2b;
>
> or
>
> B.      Involvement of one major peripheral joint in each upper extremity (i.e., shoulder, elbow, or wrist-hand), resulting in inability to perform fine and gross movements effectively, as defined in 1.00B2c.

20 C.F.R. Part 404, Subpart P, App. 1, § 1.02.

### Listing 12.04

Listing 12.00 is the general listing for impairments characterized as Mental Disorders.  Listing 12.04 provides as follows:

> 12.04  Affective Disorders: Characterized by a disturbance of mood, accompanied by a full or partial manic or depressive syndrome. Mood refers to a prolonged emotion that colors the whole psychic life; it generally involves either depression or elation.
>
> The required level of severity for these disorders is met when the requirements in both A and B are satisfied, or when the requirements in C are satisfied.

A.    Medically documented persistence, either continuous or intermittent, of one of the following:

1.    Depressive syndrome characterized by at least four of the following:

***

2.    Manic syndrome characterized by at least three of the following:

***

or

3.    Bipolar syndrome with a history of episodic periods manifested by the full symptomatic picture of both manic and depressive syndromes (and currently characterized by either or both syndromes);

AND

B.    Resulting in at least two of the following:

1.    Marked restriction of activities of daily living; or

2.    Marked difficulties in maintaining social functioning; or

3.    Marked difficulties in maintaining concentration, persistence, or pace; or

4.    Repeated episodes of decompensation, each of extended duration;

OR

C.    Medically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, and one of the following:

1.    Repeated episodes of decompensation, each of extended duration; or

2.      A residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or

3.      Current history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement.

20 C.F.R. Part 404, Subpart P, App. 1, § 12.04.

### The ALJ's Listing Analysis

The ALJ, in analyzing Plaintiff's ability to meet or medically equal Listing 1.00 or 12.00, made the following finding:

A review of the Listing of Impairments with particular attention to listing 1.00 and 12.00 evidenced the claimant did not meet a listing as she was able to use the extremities effectively.

[R. 34.]

### Discussion

The regulations provide that the burden of establishing disability under the Listings is on the claimant.  *See* 42 U.S.C. § 423(d)(5)(A); 20 C.F.R. § 416.912(c); *Hall v. Harris*, 658 F.2d 260, 264 (4th Cir. 1981).  It is not enough that the claimant has the diagnosis of a listed impairment; she must also evidence the requirements for the listing of that impairment.  20 C.F.R. § 416.925(d); *see Bowen v. Yuckert*, 482 U.S. 137, 146 and n. 5 (1987) (noting the claimant has the burden of showing that his impairment is presumptively disabling at step three of the sequential evaluation and that the Act requires him to furnish medical evidence regarding his condition).  Merely "coming close" to meeting a listing is not enough to establish equivalence, and a claimant cannot establish equivalence merely by showing that the overall functional impact of her combination of impairments was as severe

as that of a listed, i.e., presumptively disabling, impairment.  *See Sullivan v. Zebley*, 493 U.S. 521, 531 (1990).  Instead, the claimant must present medical findings equal in severity to every criterion in a listing.  *See id.*

Here, although the Court finds the ALJ's discussion regarding whether Plaintiff's impairment met or medically equaled the Listings to be sparse, Plaintiff has failed to explain how she meets or medically equals the criteria of either Listing 1.02 or Listing 12.04 A and B or C.  Additionally, Plaintiff has failed to direct the Court to evidence of record supporting her claim.  Upon review of the evidence, the Court notes that Listing 1.02 requires the presence of "gross anatomical deformity" and an "inability to perform fine and gross movements effectively," but the medical evidence of record in this case does not support these findings. [*See, e.g.*, R. 378 (no skeletal tenderness or joint deformity); R. 381 (musculoskeletal musculature was normal with no skeletal tenderness or joint deformity); R. 576 (can occasionally perform fine manipulation); R. 596 (fine finger movement was done well except small finger could no reach well with thumb bilaterally).]  Additionally, the ALJ did not find Plaintiff's mental impairment to be severe at Step 2, and Plaintiff did not challenge this finding at Step 2; thus, the ALJ was not required to perform a Listing analysis with respect to Plaintiff's mental impairment.[8]  Only if an impairment is "severe" is the Commissioner to move to the next step of the analysis and determine whether the severe impairment(s) meet or medically equal a listed impairment.  *See, e.g., Washington v. Astrue*, 698 F.Supp.2d 562, 581 (D.S.C. Mar.17, 2010) (finding that an ALJ need not

---

[8]Even if Plaintiff's mental impairment were severe, she has not set forth how she meets or equals Listing 12.04.  As previously stated, to meet Listing 12.04, a claimant must satisfy either 12.04 A and B or 12.04 C. Here, Plaintiff has not carried her burden of explaining to the Court how she satisfies those requirements.

evaluate whether an impairment found to be non-severe satisfies a particular listing).

Accordingly, the decision of the Commissioner should not be reversed on this ground.

**RFC Analysis**

Plaintiff contends the ALJ's RFC assessment is flawed because the ALJ failed to

properly credit the opinions of Plaintiff's treating physician, Dr. Jeffery Harris, and

counselor, Ms. Laurice Girouard, who opined that Plaintiff's limitations would preclude light

work light. [Doc. 14 at 28.] However, the Commissioner contends that Dr. Harris merely

provided a check-the-box physical function evaluation but offered no explanation or

evidence to support the limitations indicated. [Doc. 18 at 13.] The Commissioner also

contends that Ms. Giouard is neither a physician nor a psychologist, but a licenced social

worker; accordingly, the Commissioner argues Ms. Giouard's opinion is not entitled to any

special deference. [*Id.* at 15.] Finally, the Commissioner contends that Ms. Giouard's

counseling sessions focused on Plaintiff's relationship and financial difficulties, not on her

mental limitations. [*Id.* at 14.]

The Administration has provided a definition of RFC and explained what an RFC

assessment accomplishes:

> RFC is what an individual can still do despite his or her
> limitations. RFC is an administrative assessment of the extent
> to which an individual's medically determinable impairment(s),
> including any related symptoms, such as pain, may cause
> physical or mental limitations or restrictions that may affect his
> or her capacity to do work-related physical and mental
> activities. Ordinarily, RFC is the individual's maximum
> remaining ability to do sustained work activities in an ordinary
> work setting on a regular and continuing basis, and the RFC
> assessment must include a discussion of the individual's
> abilities on that basis. A "regular and continuing basis" means
> 8 hours a day, for 5 days a week, or an equivalent work
> schedule. . . .

SSR 96-8p, 61 Fed. Reg. 34,474–01, at 34,475 (July 2, 1996) (internal citation and footnotes omitted). The RFC assessment must first identify Plaintiff's functional limitations or restrictions and assess his work-related abilities on a function-by-function basis, including the functions in paragraphs (b), (c), and (d) of 20 C.F.R. 404.1545 and 416.945. *See id.* Only after this identification and assessment may RFC be expressed in terms of the exertional levels of work: sedentary, light, medium, heavy, and very heavy. *Id.*

In assessing RFC, the ALJ must consider limitations and restrictions imposed by all of a claimant's impairments, including those that are not severe. *Id.* at 34,477. While a non-severe impairment standing alone may not significantly limit a claimant's ability to do basic work activities, it may be crucial to the outcome of a claim when considered in combination with limitations or restrictions due to other impairments. *Id.* If the ALJ finds a combination of impairments to be severe, "the combined impact of the impairments shall be considered throughout the disability determination process." 42 U.S.C. §§ 423(d)(2)(B), 1382c(a)(3)(G).

Additionally, the Administration has determined that in assessing RFC, the ALJ

> must consider only limitations and restrictions attributable to medically determinable impairments. It is incorrect to find that [a claimant] has limitations or restrictions beyond those caused by his or her medical impairment(s) including any related symptoms, such as pain, due to factors such as age or height, or whether the [claimant] had ever engaged in certain activities in his or her past relevant work (e.g., lifting heavy weights.) Age and body habitus (i.e., natural body build, physique, constitution, size, and weight, insofar as they are unrelated to the [claimant]'s medically determinable impairment(s) and related symptoms) are not factors in assessing RFC . . . .

SSR 96-8p, 61 Fed. Reg. at 34,476. To assess a claimant's RFC, the ALJ must consider all relevant evidence in the record, including medical history, medical signs, laboratory

findings, lay evidence, and medical source statements. *Id.* at 34,477. SSR 96-8p specifically states, "[t]he RFC assessment must always consider and address medical source opinions. If the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted." *Id.* at 34,478.

With respect to medical opinions of record regarding Plaintiff's impairments and limitations, the ALJ is obligated to evaluate and weigh medical opinions "pursuant to the following non-exclusive list: (1) whether the physician has examined the applicant, (2) the treatment relationship between the physician and the applicant, (3) the supportability of the physician's opinion, (4) the consistency of the opinion with the record, and (5) whether the physician is a specialist." *Johnson v. Barnhart*, 434 F.3d 650, 654 (4th Cir. 2005) (citing 20 C.F.R. § 404.1527). Courts typically "accord 'greater weight to the testimony of a,treating physician' because the treating physician has necessarily examined the applicant and has a treatment relationship with the applicant." *Id.* (quoting *Mastro*, 270 F.3d at 178). While the ALJ may discount a treating physician's opinion if it is unsupported or inconsistent with other evidence, *Craig*, 76 F.3d at 590, the ALJ must still weigh the medical opinion based on the factors listed in 20 C.F.R. § 416.927(c).

The opinion of a treating physician is given controlling weight only if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 416.927(c)(2). Additionally, Social Security Ruling ("SSR") 96-2p requires that an ALJ give specific reasons for the weight given to a treating physician's medical opinion:

> [A] finding that a treating source medical opinion is not well
> supported by medically acceptable clinical and laboratory
> diagnostic techniques or is inconsistent with the other

24

> substantial evidence in the case record means only that the opinion is not entitled to "controlling weight," not that the opinion should be rejected. Treating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. 404.1527 and 416.927. In many cases, a treating source's opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight.

1996 WL 374188, at *4 (July 2, 1996). However, not every opinion offered by a treating source is entitled to deference:

> Medical sources often offer opinions about whether an individual who has applied for title II or title XVI disability benefits is "disabled" or "unable to work," or make similar statements of opinions. In addition, they sometimes offer opinions in other work-related terms; for example, about an individual's ability to do past relevant work or any other type of work. Because these are administrative findings that may determine whether an individual is disabled, they are reserved to the Commissioner. Such opinions on these issues must not be disregarded. However, even when offered by a treating source, they can never be entitled to controlling weight or given special significance.

SSR 96-5p, 1996 WL 374183, at *5 (July 2, 1996); *see also* 20 C.F.R. § 416.927(d)(3) (stating an ALJ does not have to "give any special significance to the source of an opinion on issues reserved to the Commissioner," such as an opinion that the claimant is disabled, the claimant's impairment or impairments meets or equals a listing, or the claimant has a certain residual functional capacity).

### The ALJ's RFC Assessment

As previously stated, the ALJ found that Plaintiff retained the residual functional capacity to perform light work except for occasional forceful bilateral grasping, twisting, and turning and a need to avoid concentrated exposure to vibration. [R. 34, Finding 4.] The ALJ indicated that, after careful consideration of the evidence, although she found Plaintiff's

25

medically determinable impairments could reasonably be expected to cause the alleged

symptoms, Plaintiff's statements concerning the intensity, persistence and limiting effects

of these symptoms were not credible to the extent they are inconsistent with the ALJ's RFC

assessment.  [R. 36.]  The ALJ explained her reasoning as follows:

> While the Administrative Law Judge finds that the claimant has an impairment, the record does not support the degree of limitation alleged.  The assessments of the State agency physicians in Exhibits 20F /25F are not unreasonable and are given considerable weight particularly in light of the claimant's reports of a positive response to treatment and her reported activities.  The alleged limitations in sitting, standing, walking, using the hands, lifting, carrying, attention, concentration, memory, need to lie down, need for frequent absences, and inability to leave the home are not substantiated by competent medical evidence to the degree alleged.  Further, the alleged severity, frequency, and duration of the claimant's depression, anxiety, and pain is not supported by the weight of the medical evidence to the degree alleged.  The claimant testified she never worked longer than three months, due to absenteeism from depression; she could not concentrate on work, felt that people were going to hurt her, had stress from being shut up in one place, and could not stand; she had persistent problems with the hands as surgery and physical therapy had not helped; she was on Motrin; she told Dr. Harris her right hand improved after surgery but it had not; she could not carry things, cut or write more than one or two sentences due to hand pain; she had anger, forgetfulness, and paranoia; and she lived with her children/boyfriend, cooked, cared for her children, received occasional assistance from a mother or a friend, drove until two or three months before the hearing, used public transportation, rode with others, attended appointments, and rarely did laundry as she could not go out.  At the supplemental hearing, she testified she had depression and constant pain in the hands with numbness such that she did not leave the home four to six days a week as treatment was not helping and that she was angry all the time if she did not take her medication. Persistent adverse side effects of medications that would preclude the performance of sustained competitive work over a normal workday, in the positions described by the impartial vocational expert, have not been established as the claimant and Dr. Harris denied side effects. The claimant's testimony is not

entirely credible as she alleged psychiatric symptoms inconsistent with her presentation, unremarkable mental status exams, and reported activities. Further, she testified that she told Dr. Harris that her right hand improved post surgery when it did not, and that she had persistent problems with the hands as surgery and physical therapy did not help, yet examinations revealed improved findings and she informed multiple sources that she did well post surgery, until the Summer of 2010, when her symptoms began to reoccur.

The claimant was treated for bilateral CTS and underwent bilateral releases with improvement. Despite her reports of swelling in the hands, examinations generally noted none. Examinations generally revealed she was healthy appearing, well developed, and in no distress with no swelling, no atrophy, 5/5 strength, within normal extremities range of motion, normal musculature, no skeletal tenderness or joint deformity, normal monofilament, no edema, and no definite sensory loss. The form by Dr. Harris at Exhibit 32F regarding the claimant's functioning is given limited weight as it is not consistent with the claimant's reported activities, the limited examination findings or the claimant's presentation. Further, he assessed limitations such as an inability to be exposed to dust, fumes, and gases despite the lack of diagnosis for such a limitation. Therefore, his opinion regarding the claimant's ability to work appears based on the claimant's subjective statements rather than objective findings. Further, the claimant declined physical therapy after her symptoms recurred, indicating she did not feel these warranted such. Dr. Kaplan testified the claimant had two consultations with no evidence beyond the operation regarding continuing problems and complaints of ongoing weakness. At the supplemental hearing, Dr. Kaplan testified the claimant was seen for increased thyroid activity, and treated with radioactive iodine, then thyroid replacement medication, with complaints of fatigue and normal thyroid testing. He noted that hypothyroidism could cause fluid accumulation though the claimant had normal testing. He also testified the claimant was seen for anxiety, vertigo, swelling in the hands and leg pain, a mood disorder, bilateral CTS with numbness/weakness/pain in the hands that was treated with surgery, and an episode of suicidal thoughts with an evaluation reflecting a recurrence of CTS symptoms with a positive finding on one side and normal fine manipulation. He concluded that prior to the January of 2010 release the claimant would have had difficulty with repetitive use of the hands, then afterwards

27

there was little in the record until Dr. Lussier's report suggested a limitation in repetitive movement. Thus, the Administrative Law Judge finds the claimant had bilateral CTS that resolved with treatment then gradually recurred with symptoms that limited but did not preclude functioning.

[R. 36–37.]

### Medical Evidence

#### Dr. Jeffrey Harris

Plaintiff saw Dr. Jeffrey Harris of Blackstone Valley Health Center on July 30, 2009 for depression and "experiencing anxious, fearful thoughts, irritable mood, diminished interest or pleasure, fatigue or loss of energy, feelings of guilt or worthlessness, poor concentration, indecisiveness, restlessness or sluggishness, significant change in appetite (weight loss or gain greater than 5%) and sleep disturbance. Pertinent negatives include hallucinations, manic episodes, panic attacks or thoughts of death or suicide. Patient has the symptoms of a major depressive episode." [R. 547.] Plaintiff was also seen for thyroid problems and for a blood pressure check. [*Id.*]

On August 25, 2009, Plaintiff saw Dr. Harris on follow up for a blood pressure check and for depression. [R. 545.] On September 14, 2009, Plaintiff saw Dr. Harris complaining of numbness, neuropathy, and weakness in both hands. [R. 544.] Dr. Harris described the severity of Plaintiff's symptoms as "moderate" and the status as "worsening." [*Id.*] Again, Dr. Harris noted Plaintiff's musculoskeletal musculature was normal with no skeletal tenderness or joint deformity. [R. 381.] A monofilament exam was normal, no edema was present, and there was no cyanosis. [*Id.*]

On September 29, 2009, Plaintiff saw Dr. Harris on follow up for bilateral numbness and tingling on distal ends of all digits with discomfort radiating proximally to elbow; on

follow up for depression; and for hypertension with associated symptoms of chest pain, headache, and tiredness.  [R. 542.]  On exam, Dr. Harris noted normal musculature, no skeletal tenderness or joint deformity, normal extremities, and no edema or cyanosis.  [R. 543.]  He also commented that he could not "detect definite sensory loss in mid nn distrib," but that "bilateral biceps tendon reflexes diminished."  [*Id.*]

On November 19, 2009, Plaintiff saw Dr. Harris for a cough, depression, and on follow-up for hand pain.  [R. 540.]  An EMG showed bilateral carpal tunnel.  [*Id.*]  Notes indicate Plaintiff's depression was worsening that Plaintiff was "experiencing anxious, fearful thoughts, compulsive thoughts or behaviors, irritable mood, diminished interest or pleasure, fatigue or loss of energy, feelings of guilt or worthlessness, poor concentration, indecisiveness, restlessness or sluggishness, significant change in appetite (weight loss or gain greater than 5%) and sleep disturbance.  Pertinent negatives include hallucinations, manic episodes, panic attacks or thoughts of death or suicide.  Patient has the symptoms of a major depressive episode."  [*Id.*]

On a follow-up visit on December 31, 2009, Plaintiff presented with complaints of sleep disturbance, and treatment notes indicate that Plaintiff was "scheduled to have carpal tunnel surgery at RIH on Jan-18."  [R. 537.]  Plaintiff was noted to have "[m]ajor depressive affective disorder, recurrent epi."  [*Id.*]  Dr. Harris noted "[m]ild erythema R lower leg compared to L.  No ulcerations, pustules, signs of trauma.  Scattered superficial varices."  [R. 538.]  Dr. Harris also noted Plaintiff's "[e]xtremities appear normal," "[n]o edema or cyanosis," and "[t]he patient has a(n) depressed affect . . . is not anxious, does not exhibit compulsive behavior, has normal language, does not have pressured speech."  [R. 538.]

On February 11, 2010, Plaintiff saw Dr. Harris on follow-up for carpal tunnel surgery

29

and for hypothyroidism, depression, and hypertension.  [R. 534.]  On February 23, 2010, Plaintiff saw Dr. Harris on follow up for hypothyroidism.  [R. 532.]  On March 23, 2010, Plaintiff presented to Dr. Harris with complaints of lower leg pain, difficulty going to sleep, night pain, night-time awakening, numbness, and tingling in legs and tenderness.  [R. 530.] Dr. Harris also noted bilateral burning of both LE's with some redness and one wine-colored patch inferior to R medial malleolus, and numbness in both heels and that there was no overt edema but that extremities were "tender to direct palpation of anterior [and] posterior LEs bilaterally."  [R. 531.]  On April 1, 2010, Plaintiff presented to Dr. Harris with complaints of leg pain and depression.  [R. 528.]  Dr. Harris noted that Plaintiff was improving on Citalopram but still unable to hold a regular job [*id.*] and was in no condition to engage in gainful employment [R. 454].

On May 11, 2010, Plaintiff presented to Dr. Harris with complaints of chest pain and swelling in both feet.  [R. 527.]  On June 8, 2010, Plaintiff saw Dr. Harris on follow up for hypothyroid with symptoms of nervousness, rapid heart beat, and tremor.  [R. 524.]  On exam, Plaintiff was negative for bone/joint symptoms and weakness, alert and orientated, with no unusual anxiety or evidence of depression.  [R. 524–25.] On July 15, 2010, Plaintiff presented to Dr. Harris with complaints of fatigue with associated symptoms of depression and a depressed effect.  [R. 521–22.]  Dr. Harris noted normal musculature, no joint deformities or abnormalities, normal range of motion for all four extremities for age, depressed affect, and no motor or sensory deficits.  [R. 522.]  On September 21, 2010, Plaintiff presented to Dr. Harris on follow up for depression and for obesity and hypertension. [R. 519.]   Dr. Harris noted no unusual anxiety or evidence of depression. [R. 520.]

30

On October 8, 2010, Plaintiff saw Dr. Harris for issues related to her depression, anxiety, and stress. [R. 550.] Dr. Harris noted new stressors, including sadness regarding her father's move to North Carolina and dissatisfaction with her partner. [*Id.*] Dr. Harris assigned Plaintiff a GAF score of 51 and continued her on prescribed treatment of Citalopram and Seroquel. [R. 551.] On December 7, 2010, Plaintiff saw Dr. Harris for hypothyroid and depression. [R. 553.] On exam, Dr. Harris noted no edema, cyanosis, or clubbing; no motor or sensory deficits; and no unusual anxiety or evidence of depression. [R. 554.]

On January 4, 2011, Plaintiff saw Dr. Harris with complaints of pain in her neck and low back resulting in decreased mobility, night pain, night-time awakening, spasms following an auto accident on January 2, 2011. [R. 556.] On exam, Plaintiff had reduced range of motion in her neck to the right, tension of right trapezius/levator scapulae; no cervical or supraclavicular adenopathy; posterior tenderness in the spine; paravertebral muscle spasm; right lumbosacral tenderness; negative straight leg raising test with the patient supine; and negative straight leg raising test with the patient sitting. [R. 557.] No edema, cyanosis, or clubbing was noted; cranial nerves were intact; no motor or sensory deficits were noted; and no unusual anxiety or evidence of depression was noted. [*Id.*] Plaintiff was diagnosed with whiplash injury to the neck and given a muscle relaxant. [*Id.*]

On April 19, 2011, Dr. Harris completed a Physical Capacity Evaluation form for Plaintiff indicating she retained the ability to sit for 2 hours in an 8-hour workday, stand for 1 hour in an 8-hour workday, walk for 1 hour in an 8-hour workday, and sit/stand in combination for 1 hour in an 8-hour workday. [R. 576.] Dr. Harris also opined that Plaintiff could occasionally lift and carry up to 5 pounds but never lift and carry more than 5 pounds;

31

use her left and right arms and hands for simple grasping, reaching, and fine manipulation but not for pushing and pulling; and occasionally bend and squat but never kneel or crawl. [*Id.*] Additionally, Dr. Harris opined that Plaintiff could never be exposed to unprotected heights; moving machinery; noise and vibration; extreme temperatures; or dust, fumes, and gas. [*Id.*] In supplemental questions to the Physical Capacity Evaluation, Dr. Harris opined that Plaintiff experienced no side effects from her medications, that her physical symptoms and limitations caused emotional difficulties such as anxiety or depression, and that her impairments were expected to last twelve months. [R. 577.] Dr. Harris also opined that Plaintiff would need to take unscheduled breaks lasting more than 30 minutes during an 8-hour workday on a daily basis and that she would miss work more than three times a month as a result of her impairment or treatment. [R. 577.]

### Ms. Giouard, LICSW

On January 27, 2011, Plaintiff saw Laurice Girouard, LICSW of Blackstone Valley Community Healthcare for issues of anxiety, depression, and stress. [R. 559.] Ms. Girouard talked to Plaintiff about her missed appointments with Ms. Girouard and with Dr. Thamara Davis, as well as her difficulty in taking action on her own behalf, such as exercise, healthy diet, and increased activity. [*Id.*] Ms. Girouard assigned a GAF score of 50, continued Plaintiff's treatment as prescribed, and gave her a referral to pschotherapy. [R. 560.] On February 18, 2011, Ms. Girouard again saw Plaintiff for anxiety, depression, and stress. [R. 562.] Plaintiff discussed her ambivalence about relocating to South Carolina with her parents and her ongoing partner relational problems. [*Id.*] Ms. Girouard assigned a GAF score of 51 and continued Plaintiff's treatment plan as prescribed. [R. 563.] On March 7, 2011, Plaintiff saw Ms. Girouard again for anxiety, depression, and

stress. [R. 568.] Plaintiff showed a mild decrease in symptoms of anxiety and depression, and Ms. Girouard assigned a GAF score of 53. [*Id.*]

On April 23, 2011, Ms. Girouard completed a Mental Residual Functional Capacity Assessment for Plaintiff, indicating that Plaintiff was markedly limited in the following categories:

1.    The ability to remember locations and work-like procedures;

2.    The ability to understand and remember detailed instructions;

3.    The ability to carry out detailed instructions;

4.    The ability to maintain attention and concentration for extended periods;

5.    The ability to perform activities within a scheduled, maintain regular attendance, and be punctual within customary tolerances;

6.    The ability to sustain an ordinary routine without special supervision;

7.    The ability to work in coordination with or the proximity to others without being distracted by them;

8.    The ability to make simple work-related decisions;

9.    The ability complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent number and length of rest periods;

10.    The ability to accept instructions and respond appropriately to criticism from supervisors;

11.    The ability to respond appropriately to changes in the work setting;

12.    The ability to travel in unfamiliar places or use public transportation; and

13.    The ability to set realistic goals or make plans independently of others.

[R. 580–81.]  Ms. Girouard indicated Plaintiff was moderately limited in the following categories:

1.   The ability to understand and remember very short and simple instructions;

2.   The ability to carry out detailed instructions;

3.   The ability to interact appropriately with the general public;

4.   The ability ask simple questions or request assistance; and

5.   The ability to be aware of normal hazards and take appropriate precautions.

[*Id.*]  Finally, Ms. Girouard indicated Plaintiff was not significantly limited in the following categories:

1.   The ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes; and

2.   The ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness.

[*Id.*]  Ms. Girouard concluded that Plaintiff suffered from multiple medical conditions and psychological problems, which made her unable to meet the demands of a competitive workplace and that the stressors associated with work would exacerbate her depression and anxiety.  [R. 582.]

In supplemental questions to the Mental Residual Functional Capacity Assessment, Ms. Girouard opined that Plaintiff's diagnoses were major depression, recurrent and anxiety.  [R. 578.]  Ms. Girouard further estimated the degree of impairment of Plaintiff's ability to relate to other people as moderately severe; of restriction of daily activities as moderate; and of deterioration of personal habits as mild.  [*Id.*]  Based on Ms. Girouard's

evaluation of Plaintiff's psychiatric status, Ms. Girouard opined that Plaintiff had severe limitations in her ability to do the following on a sustained basis in a routine work setting:

1.      Respond to customary work pressures; and

2.      Perform varied tasks.

[R. 578–79.]  Ms. Girouard opined that Plaintiff had moderately severe limitations in her ability to do the following on a sustained basis in a routine work setting:

1.      Understand, carry out, and remember instructions;

2.      Respond appropriately to supervision;

3.      Respond appropriately to co-workers; and

4.      Perform repetitive tasks.

[*Id.*]  Finally, Ms. Girouard opined that Plaintiff had moderate limitations in her ability to do the following on a sustained basis in a routine work setting:

1.      Perform simple tasks.

[*Id.*]  Ms. Girouard indicated that a psychological evaluation was obtained and considered in forming her opinions.  [R. 579.]  Further, Ms. Girouard opined that Plaintiff's impairment would cause interruptions during an 8 hour workday and that she would be absent from work more than three times a month as a result of her impairments or treatment.  [*Id.*]  Consequently, Ms. Girouard opined that Plaintiff can not sustain competitive employment on a full-time, ongoing basis.  [*Id.*]

### *State Agency Assessments*

On March 9, 2010, Dr. Erik P. Purins performed a Physical Residual Functional Capacity Assessment, finding Plaintiff could occasionally lift 20 pounds, frequently lift 10 pounds, stand and/or walk about 6 hours in an 8-hour workday, sit (with normal breaks)

about 6 hours in an 8-hour workday, and push and/or pull in an unlimited manner, other than as shown for lifting and/or carrying.  [R. 446.]  Dr. Purins assigned no postural, visual, or communicative limitations, assigned manipulative limitations only with respect to Plaintiff's ability to handle (gross manipulation), and provided that Plaintiff's only environmental limitation was to avoid concentrated exposure to vibration. [R. 447–449.]  On June 22, 2010, Dr. Joseph Callaghan provided a one-paragraph case analysis, affirming Dr. Purins' March 9, 2010 assessment.  [R. 511.]

On February 6, 2010, Dr. Michael Slavit completed a Psychiatric Review Technique form related to Plaintiff's affective disorder and anxiety related disorders.  [R. 418–431.] Dr. Slavit found that Plaintiff had mild limitation in her activities of daily living, maintaining social functioning, and maintaining concentration, persistence, and pace, and suffered no episodes of decompensation.  [R. 428.]  Dr. Slavit specifically noted that Dr. Hussein at the Providence Center "found claimant's thought process to be logical and coherent" and that Plaintiff "worked 2 years as a video store cashier, 1 yr doing temp labor and 1 year in a warehouse."  [R. 430.]  Additionally, Dr. Slavit noted that "[c]laimant has poor self-esteem and worries. Nonetheless she [self reports] that she drives, shops, preps meals, knows how to do hh tasks, and handles bank accts and pays bills."  [*Id.*]

A Psychiatric Consultative Exam Report completed by Dr. Luz Teixeira on March 3, 2010 notes that Dr. Teixeira observed that Plaintiff was overweight for her height, her gait appeared within normal limits, and she did not appear to have problems sitting or standing up.  [R. 439.]  Plaintiff denied a history of inpatient psychiatric treatment and reported that she had outpatient psychiatric care at the Providence Center, but dropped out because did not like her psychiatrist.  [R. 440.]  She reported being seen at Blackstone Valley

Community Center where she was prescribed medication and had counseling. [R. 440–441.] Plaintiff also reported that her episodes of depression along the years had been caused by stress, rejection from parents, fear of been rejected by people, and feeling alone. [R. 441.]

Notes from Plaintiff's mental status exam by Dr. Teixeira indicate that Plaintiff's affect was unremarkable initially, but became depressed as the evaluation progressed; her insight and judgment did not seem impaired; her attention and concentration appeared fair; her memory did not appear impaired for events in her life, and she had no problems recalling a simple sentence and 3 unrelated words after 5 minutes; she could use abstract thinking in her interpretation of well-known proverbs; her ability to handle basic arithmetic calculations appeared intact; and, based on the present evaluation, her cognitive functioning appeared to be within the average range. [*Id.*] Dr. Teixeira concluded that given Plaintiff's level of cognitive functioning and psychiatric condition, she was able to manage her own funds. [R. 443.]

On June 16, 2010, Dr. J. Stephen Clifford completed a Psychiatric Review Technique form, indicating that Plaintiff had no limitations in activities of daily living, social functioning, maintaining concentration, persistence, and pace, and no episodes of decompensation. [R. 507.]

On May 18, 2011, Dr. Mary Lussier performed a consultative examination, assessing Plaintiff's hand functioning due to her CTS. [R. 596.] On physical exam, Plaintiff's motor "[s]trength was 4/5 at left APB and 4+ at opponents pollicis compare with normal on the right. Strong grip bilaterally. Otherwise strength is normal at bilateral deltoid, biceps, triceps, wrist extensors, finger extensors, interossei, FCU, FPL, pronator

teres, and brachioradialis. No drift." [*Id.*] Tone was normal; fine finger movement was done well except that the small finger could be reached well with the thumb bilaterally becasue it provoked pain in the forearms. [*Id.*] Reflexes were also found to be symmetric at 2 at the triceps and 1+ at the brachioradialis; there was mild difficulty manipulating a safety pin off of a flat surface bilaterally; and pinprick was decreased in the entire left arm. [R. 597.] With respect to Plaintiff's extremities, Dr. Lussier noted "Bilateral CTR scars. Slight decrease in mass of left thenar eminence. Phelan sign: provokes numbness in the fingers by 30 seconds, associated with forearm pain." [*Id.*] Dr. Lussier concluded that her exam was compatible with recurrence of CTS with the possibility of some component of tendinitis and/or arthritis, although that is not Dr. Lussier's specialty area. [*Id.*]

### Analysis

As stated above, Plaintiff contends the ALJ's RFC assessment is flawed because she failed to properly credit the opinions of Dr. Harris and Ms. Girouard and improperly gave greater weight to the opinions of state consultants. [Doc. 14 at 28.] The Court disagrees.

The ALJ explained her reason for giving limited weight to Dr. Harris's opinion regarding Plaintiff's functional limitations, finding that the limitations were not consistent with examination findings and Plaintiff's reported activities. [R. 37.] For instance, although Dr. Harris opined that Plaintiff retained the ability to sit for 2 hours in an 8-hour workday, stand for 1 hour in an 8-hour workday, walk for 1 hour in an 8-hour workday, and sit/stand in combination for 1 hour in an 8-hour workday [R. 576], there is no support in the record for these limitations and, contrary to this finding, Dr. Harris's notes consistently note normal musculature with no skeletal tenderness or joint deformity [*see, e.g.*, R. 378, 381, 543,

522], normal range of motion for all four extremities, and no motor or sensory deficits [R. 522]. Additionally, Dr. Teixeira noted that Plaintiff did not appear to have problems sitting or standing up. [R. 439.] Even after her car accident in January 2011, treatment notes showed negative straight leg raising tests, no edema, cyanosis, or clubbing, and no motor or sensory deficits. [R. 557.]

Dr. Harris also noted limitations in lifting (up to 5 pounds only) and found Plaintiff could not use her arms and hands for repetitive pushing and pulling. [R. 576.] Treatment notes, however, make no findings to support these limitations and often note normal extremities, and no edema or cyanosis. [*See, e.g.*, R. 378, 543.] Dr. Lussier, upon examining Plaintiff's hand function, found that Plaintiff 's motor strength was 4/5 in the left and normal in the right; strong grip bilaterally; normal tone; and fine finger movement was done well with the exception of the small finger being unable to reach the thumb bilaterally. [*Id.*] Additionally, the ALJ noted that Dr. Harris assessed limitations such as an inability to be exposed to dust, fumes, and gases despite the lack of diagnosis for such a limitation. [R. 37.] The ALJ concluded that Dr. Harris's opinion regarding Plaintiff's ability to work appeared to be based on the her subjective statements rather than objective findings. Based on the above, the ALJ found that Dr. Harris's opinion that Plaintiff's recurrent major depression diagnosis prevented work was not consistent with Plaintiff's reported activities,[9]

---

[9]Plaintiff's activities of daily living included living with her boyfriend/children, hobbies, listening to music, caring for her children, dancing/singing, working/looking for work, using community services/resources, socializing with family/a friend, driving, doing household chores/laundry, cooking, shopping, managing finances, watching television, playing cards, taking her children to/from school, attending appointments, performing self-care independently, taking medication, going outside two to three times a day, going out alone, having no problem with authority figures, receiving occasional assistance from a mother or a friend, using public transportation, and riding with others. [R. 33.]

the essentially unremarkable mental status exams, or his observations that Plaintiff had no

unusual anxiety or evidence of depression.  [R. 32–33, 37.]

> With respect to Ms. Girouard's opinion, the ALJ explained that

> > The assessments by Ms. Girouard, that the claimant had
> > moderately to moderately severely, moderately to severely or
> > markedly impaired mental functioning, with an inability to
> > sustain work are not consistent with the essentially
> > unremarkable mental status exams and observations that she
> > was well groomed with good hygiene, manicured nails, and a
> > mildly labile mood/affect yet alleging suicidal thoughts and
> > spending much of her time in bed due to worsening psychiatric
> > symptoms.  Also, the claimant purported a host of psychiatric
> > symptoms on her initial presentation many of which she later
> > denied and she was focused on difficulties with her boyfriend
> > with a report that they continued to live together for financial
> > reasons.

[R. 32.] Ms. Girouard's treatment notes suggest that Plaintiff's anxiety and depression are

related to "stress due to family stressors" and "partner/relational problems."  [R. 559.] Ms.

Girouard's March 2, 2011 treatment notes indicate that Plaintiff's behavior and

psychomotor behaviors were unremarkable; speech and affect were appropriate; memory

intact, and mood anxious; reasoning, impulse control, judgment, insight were good; thought

processes were logical; and thought content was unremarkable.  [R. 565.]  As the ALJ

noted, "even when she presented for suicidal thoughts, she was well dressed with

manicured nails, good hygiene, and only a mildly labile mood/affect, which did not support

the severe degree of symptomatology alleged at the time including that she spent much of

her time in bed."  [R. 32.]  Additionally, the ALJ noted that "[o]n February 6, 2010, and June

16, 2010, non-examining sources assessed no severe psychiatric impairment."  [R. 31.]

> While Plaintiff's takes issue with the ALJ's treatment of Dr. Harris and Ms. Girouard's

opinions, Plaintiff fails to direct the Court to any error or any evidence not taken into

consideration by the ALJ that would support the limitations suggested by Dr. Harris.  The law is clear that a treating physician's opinion is only given controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] record."  20 C.F.R. § 416.927(c)(2).  Thus, "[b]y negative implication, if a physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight."  *Craig v. Chater*, 76 F.3d 585, 590 (4th Cir. 1996).  This standard, of course, is more stringent than the old "treating physician rule," which accorded a treating physician's opinion controlling weight unless the record contained persuasive evidence to the contrary.  *See Coffman*, 829 F.2d at 517.  The ALJ clearly explained her finding that Dr. Harris's opinion was not supported by his own treatment notes and was inconsistent with other substantial evidence of record.

Additionally, it is undisputed that Ms. Girouard is not an acceptable medical source as defined in the regulations, *see* SSR 06–03p, 2006 WL 2329939, at *2, *5 (Aug. 9, 2006) (examples of a medical sources who are not considered an acceptable medical source include: "nurse practitioners, physician assistants, licensed clinical social workers, naturopaths, chiropractors, audiologists, and therapists"), and, thus, was not entitled to controlling weight like a treating physician's opinion.  *See id.*; *see also* 20 C.F.R. § 416.913(d).  Accordingly, the decision of the Commissioner should not be reversed on this ground.

**Past Relevant Work**

Plaintiff contends the ALJ erred in finding Plaintiff could perform her past relevant work as well as unskilled, light work and unskilled, sedentary work because of the ALJ's

41

failure to acknowledge the treating physicians' opinions related to Plaintiff's RFC. [Doc. 14 at 29.]

At Step 4 of the sequential evaluation, the ALJ must assess the claimant's RFC and determine whether the claimant has an impairment that prevents past relevant work. 20 C.F.R. § 416.920(a)(4)(iv). In making this determination, the ALJ can utilize a vocational expert ("VE"), a vocational specialist, or other resources, such as the DOT, to determine whether a claimant can perform his or her past relevant work. *Id.* §416.960(b)(2). "Past relevant work" is defined by the regulations as "work that you have done within the past 15 years, that was substantial gainful activity, and that lasted long enough for you to learn to do it." 20 C.F.R. § 416.960(b)(1). A plaintiff is not disabled under the Act if she can return to past relevant work as it is customarily performed in the economy or as the claimant actually performed the work. SSR 82–62. The plaintiff bears the burden of establishing her inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5).

In this case, the sequential evaluation terminated at Step Four, where Plaintiff had the burden of proving she could not perform her past relevant work. The ALJ found that, based on the RFC, Plaintiff could return to her previous work as a  as a secretary and a cashier. [R. 38.] Additionally, the ALJ, although not required to do so, made alternative findings at Step 5 and utilized the services of a VE to find that there were other jobs existing in the national economy that Plaintiff could perform. [*Id.*] As noted above, the Court has found no error with respect to Plaintiff's RFC based on the medical records. Plaintiff has the burden of proof on this issue, and Plaintiff has failed to show that she could not return to her past relevant work. Accordingly, the decision of the Commissioner should not be reversed on this ground.

42

## CONCLUSION

Wherefore, based upon the foregoing, its is ordered that the Commissioner's decision be AFFIRMED.

IT IS SO ORDERED.

s/Jacquelyn D. Austin
United States Magistrate Judge

July 9, 2014
Greenville, South Carolina